IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Beth Patterson Dearmitt, RN, :
                     Petitioner :
                               :
        v. : No. 1767 C.D. 2017
                               : ARGUED: September 12, 2018
Bureau of Professional and :
Occupational Affairs, State :
Board of Nursing, :
                   Respondent :


BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                          FILED: October 2, 2018

Beth Patterson Dearmitt, RN (Petitioner) petitions for review of the October 31, 2017 Final Adjudication and Order of the State Board of Nursing (Board) imposing a three-year term of probation and placing conditions on her ability to practice nursing. Petitioner argues on appeal that the Board's findings of fact are not supported by recent substantial evidence and she was prejudiced by the length of time that elapsed from the initiation of disciplinary proceedings and the Board's issuance of its final decision.

**Background**

The facts of this matter are largely undisputed. Petitioner is licensed to practice as a registered nurse in the Commonwealth. Notes of Testimony (N.T.), 11/21/14, at 219. In July 2008, Petitioner was charged with driving under the

influence (DUI) in violation of Section 3802(d)(3) of the Vehicle Code.[1]  *Id.* at 223, Ex. C-2.  Subsequently, Petitioner entered into an Alternative Rehabilitative Disposition (ARD)[2] program.  N.T., 11/21/14, at 223.  A condition of the ARD program required Petitioner to submit to random urine screenings.  N.T., 10/7/14, at 40.  During her probationary period, Petitioner submitted two suspect urine specimens – one dilute and one containing trace amounts of alcohol.  *Id.*  As a consequence, Petitioner's period of probation was extended by six months.  *Id.*  Petitioner ultimately completed the ARD program in July 2010.  N.T., 11/21/14. At 223.

Petitioner advised the Board of the DUI charge when she filed her license renewal application in October 2010.  Certified Record (C.R.), Item No. 1, Order to Show Cause, at 2.  Tania Zerbe with the Professional Health Monitoring Program (PHMP), notified Petitioner in a letter dated March 2, 2011 that she was eligible to participate in the Voluntary Recovery Program (VRP).[3]  N.T., 11/21/14, Ex. No. C-

---

[1] 75 Pa.C.S. § 3802(d)(3).

[2] ARD is a program whereby, upon successful completion of the program's requirements, an offender's record may be expunged.  *See* Pa.R.Crim.P., Chapter 3.

[3] The PHMP of the Bureau of Professional and Occupation Affairs (BPOA) assists professionals suffering from a mental or physical disorder, such as substance abuse, in obtaining treatment and monitoring to ensure they can safely practice their licensed professions. Pennsylvania Department of State Professional Health Monitoring Programs. https://www.dos.pa.gov/ProfessionalLicensing/OtherServices/ProfessionaHealthMonitoringPrograms/Pages/default.aspx.  (last visited September 13, 2018).  The PHMP comprises two programs, one of which is the VRP.  Pennsylvania Department of State VRP General Information. https://www.dos.pa.gov/ProfessionalLicensing/OtherServices/ProfessionaHealthMonitoringPrograms/Pages/Voluntary-Recovery-Program-General-Information.aspx. (last visited September 13, 2018).  Upon successful completion of the VRP, no disclosure, publication, or public record is made of the participant's involvement in the VRP or the events which precipitated his or her enrollment.  *Id.*

4. Ms. Zerbe indicated that if Petitioner did not wish to participate in the VRP, information related to her "impairment"[4] would be forwarded to the legal department of the Bureau of Professional and Occupational Affairs (BPOA). *Id.*

Petitioner mailed a letter to Ms. Zerbe on March 15, 2011, in which she detailed the reasons she did not believe VRP was appropriate in her case. N.T., 11/21/14, Ex. No. R-1. Petitioner cited her completion of the ARD program and evaluations performed by drug and alcohol counselors which indicated no further treatment was recommended. *Id.* at 3.

In a subsequent letter dated March 18, 2011, Ms. Zerbe notified Petitioner that she had not complied with the VRP enrollment procedures. N.T., 11/21/14, Ex. No. C-5. Ms. Zerbe instructed Petitioner to submit the appropriate documentation by April 1, 2011, or disciplinary action could be initiated against Petitioner's license. *Id.* By letter dated March 31, 2011, Ms. Zerbe notified Petitioner her file was closed and forwarded to the legal division of the BPOA for review and possible initiation of formal disciplinary proceedings. *Id.*, Ex. No. C-7. Neither of Ms. Zerbe's letters acknowledged receipt of Petitioner's March 15, 2011 letter.

The Board issued an order compelling Petitioner to submit to a mental and physical examination. C.R., Item No. 1, Order to Show Cause, at 3. Pursuant to that order, Lawson Bernstein, M.D., examined Petitioner on July 8, 2011 (2011 Evaluation), and reviewed her medical and pharmaceutical records. N.T., 10/7/14, Ex. No. C-9.

Dr. Bernstein's written report indicated Petitioner went through inpatient detoxification with Pyramid Health Care Facilities (Pyramid) in May 2008 for abuse of alcohol, opiates, and benzodiazepine. N.T., 10/7/14, Ex. No. C-9 at 4-5.

---

[4] Ms. Zerbe's letter did not specify the nature of Petitioner's impairment.

Petitioner sought outpatient care with Pyramid from June 25, 2008 until September 26, 2008, again for substance abuse, including opiates, alcohol, and benzodiazepine. *Id.* at 5. During that three-month period, in July 2008, Petitioner was arrested for DUI. *Id.* at 4. In July 2011, when Dr. Bernstein evaluated Petitioner, she acknowledged taking the following prescribed medications on a daily or near-daily basis: OxyContin, Exalgo XR, Ritalin, Xanax, Wellbutrin, Kapidex. *Id.* at 3. Petitioner also took Zanaflex and used fentanyl patches on an as-needed basis.[5] *Id.*

Dr. Bernstein's analysis of Petitioner's medical records led him to conclude that Petitioner suffered from long-standing alcohol dependence, benzodiazepine dependence, and opioid dependence coupled with abuse of those agents. N.T., 10/7/14, Ex. No. C-9 at 7. Dr. Bernstein expressed concern over Petitioner's receipt of "exceedingly high doses" of those same agents, as well as Ritalin, given her history of abuse and the absence of any active monitoring for abuse. *Id.* Accordingly, he recommended that Petitioner be monitored for 5 years, provide quarterly reports from her treating physician indicating she was not overusing the medications prescribed to her, enroll in treatment with a psychiatric and addiction specialist, and weekly attendance at AA/NA meetings. *Id.* at 7-8.

On December 14, 2011, the Board issued an Order to Show Cause why Petitioner's license to practice nursing should not be suspended, revoked, or otherwise restricted. C.R., Item No. 1 at 1. The Order to Show Cause directed Petitioner to respond to the charges by filing a written answer within 30 days. *Id.* The Order notes that failure to file an answer within that time could result in action

_____

[5] OxyContin and fentanyl patches were prescribed to Petitioner by Glenn Davis, M.D., for pain stemming from injuries from an alleged assault by her ex-husband in November 2007. N.T., 10/7/14, Ex. No. C-3 at 3. Dr. Davis's license to practice medicine was temporarily suspended by the Pennsylvania Board of Medicine on October 4, 2013 in part due to his opioid prescription practices. Proposed Adjudication and Order, Finding of Fact (F.F.) No. 71.

being taken without a hearing. *Id.* Petitioner responded to the Order to Show Cause on October 28, 2013, asserting the July 2008 DUI was a one-time incident and she was not in need of further treatment. C.R., Item No. 2, Petitioner's Answer to Show Cause, at 1-2. The record contains vague references to the parties engaging in settlement negotiations from 2011 to 2013. N.T., 11/21/14, at 231-233. The content of those negotiations is not part of the record, however, and the record does not indicate why Petitioner waited nearly two years to file her answer, nor why the Board declined to act on Petitioner's failure to file a response within 30 days of the date of the Order.

The Board issued an Amended Order to Show Cause on March 5, 2014. N.T., 11/21/14, Ex. C-1, Amended Order to Show Cause.[6] Petitioner filed her response on April 22, 2014. *Id.*, Ex. No. C-2, Petitioner's Response to Factual Allegations. She reiterated her assertion that the DUI was an isolated event and maintained she did not suffer from any substance abuse or dependence that would impair her judgment or ability to safely practice nursing.

Dr. Bernstein evaluated Petitioner a second time on September 17, 2014 (2014 Evaluation). He reviewed the same records provided for the 2011 Evaluation as well as more recent pharmacy records and drug screening results. N.T., 10/714, Ex. No. C-10, at 1-2.

Petitioner related to Dr. Bernstein that she stopped treating with Dr. Davis in March 2013 and she no longer took any prescription medications. N.T., 10/7/14,

---

[6] The original Order to Show Cause alleged Petitioner's license was current through October 31, 2012. C.R., Item No. 1, Order to Show Cause, at 2. The Amended Order to Show Cause corrects this date to October 31, 2014. *Id.*, Item No. 8, Amended Order to Show Cause, at 2. Paragraph No. 13 was revised in the amended document to allege Petitioner suffers from a dependence on and abuse of opioids and benzodiazepine, an unspecified cognitive disorder, and mild-to-moderate post-traumatic stress disorder. *Id.* at 3.

Ex. No. C-10, at 2. Petitioner stated she had not sought medical treatment with any provider after March 2013. *Id.* Petitioner also related she attended AA meetings twice a week. *Id.* at 3. Petitioner was employed as a private duty nurse for an 18-year-old patient, but she did not handle opioids, benzodiazepines, or other controlled substances in this position. *Id.* at 2-3.

Petitioner provided Dr. Bernstein a drug and alcohol assessment performed by Dawn Bawa, a clinician with Home Nursing Agency, a healthcare organization that provides drug and alcohol treatment. N.T., 10/7/14, Ex. No. C-10, at 2; N.T., 11/21/14, at 165. Petitioner selected the organization and was considered a "self-referral." N.T., 11/21/14, at 159. Ms. Bawa's written assessment indicated Petitioner did not require treatment for a substance abuse problem. N.T., 10/7/14, Ex. No. C-10, at 2. A urine screening obtained on January 20, 2014 was negative for opiates, and testing of Petitioner's hair and blood on September 12, 2014 found no presence of "drugs of abuse." *Id.* at 2-3.

Dr. Bernstein observed that no paper trail existed to document Petitioner's sobriety and he had to rely on her self-reported recovery. N.T., 10/7/14, Ex. No. C-10, at 5. He noted that recent drug screening results were for discrete periods of time and they did not document continuous sobriety from the date of the 2011 Evaluation. *Id.* Records from a pharmacy near Petitioner's home indicated she filled prescriptions for opioids and stimulants during the period from July 2011 through April 1, 2013. *Id.* at 4. Dr. Bernstein noted with concern Petitioner's reported attempts in April and May 2013 to fill opioid prescriptions at a different pharmacy located a substantial distance from her home. *Id.* at 4-5.

Dr. Bernstein concluded Petitioner's claims of sobriety were improbable. N.T., 10/7/14, Ex. No. C-10, at 6. He stated that Petitioner's failure to seek medical

care after she stopped treating with Dr. Davis in March 2013 called into question the existence of legitimate medical problems. *Id.* As Dr. Davis was no longer in practice due to a federal indictment related to his opioid prescription practices, Dr. Bernstein opined Petitioner's drug-free status was "based solely on a lack of ready access to drugs of abuse." *Id.* at 5. Dr. Bernstein expressed concern that Petitioner worked in an environment where she was unmonitored in any way. *Id.* at 6. Consequently, Dr. Bernstein believed Petitioner was unsafe to practice nursing unless she engaged in a substance abuse monitoring program and a drug and alcohol treatment program for a period of at least 5 years. *Id.* He also recommended Petitioner attend twice-weekly AA meetings for at least 5 years. *Id.*

The matter proceeded to a hearing prosecuted by the Pennsylvania Department of State (Commonwealth). Testimony was elicited over three days on October 21, 2014, December 9, 2014, and April 30, 2015. The Commonwealth presented the testimony of Dr. Bernstein and Kevin Evancic, a pharmacist. Petitioner, who appeared *pro se*, testified on her own behalf and presented the testimony of Ms. Bawa.[7]

Dr. Bernstein reiterated his opinion from the 2014 Evaluation that Petitioner suffered from several substance-related disorders and she was unsafe to practice nursing unless she completed a 5-year monitoring and treatment program and attended AA meetings twice a week. N.T., 10/7/14, at 30-31. In forming his opinion, Dr. Bernstein relied on records related to Petitioner's 2008 treatment at Pyramid for substance abuse, which was contemporaneous with her DUI charge. *Id.* at 32, 36. Pyramid's records described Petitioner as presenting in withdrawal from

---

[7] Petitioner's brother, Mark Patterson, also testified. The essence of his testimony is that Petitioner was "absent" from his life for about three years, but after January 2012, she was more like her old self. N.T., 11/21/14, at 205-06.

7

alcohol and opiates at the time of her admission. *Id.* at 36. He described Dr. Davis's practice of prescribing Petitioner inordinately large quantities and dosages of opioids as "questionable and even alarming." *Id.* at 46.

Dr. Bernstein testified that, when he evaluated Petitioner in 2011, he believed she was taking prescribed opiates due to legitimate medical problems, although, in his opinion, the dosages were too high. N.T., 10/7/14, at 83. Assuming such large dosages of opiates were medically necessary, Dr. Bernstein believed Petitioner would have continued to be symptomatic and require treatment after she stopped treating with Dr. Davis. *Id.* at 59. However, because Petitioner stopped taking them completely in March 2013, Dr. Bernstein believed she was taking them for the purpose of abuse. *Id.* at 84. Dr. Bernstein also considered suspect Petitioner's use of a pharmacy located far from her home due to alleged difficulty in getting prescriptions filled locally. *Id.* at 67-68. Dr. Bernstein testified that "a fact pattern where [one has] pharmacies that will not fill a prescription of a controlled substance such that the individual has to seek out other pharmacies" was consistent with abuse. *Id.* at 68.

Dr. Bernstein opined that the standard of care for individuals who presented with substance abuse required ongoing intensive treatment, such as attendance at 12-step meetings, group and individual therapy, and unannounced and unscheduled drug screenings. *Id.* at 47. He indicated such treatment must be documented so a reviewer may ascertain whether an individual's assertions of sobriety can be confirmed from objective data. *Id.* Dr. Bernstein testified that Petitioner had a well-documented substance abuse problem but she provided no documentation that indicated she sought treatment for the problem. *Id.* at 59-60. Petitioner's negative drug screenings showed, at best, that she abstained from drugs or alcohol for 30-90

8

days; the results did not document continuous sobriety from 2011 to the present. *Id.* at 61. In the absence of objective data that corroborated Petitioner's claims of sobriety, Dr. Bernstein felt Petitioner was unsafe to practice nursing. *Id.* at 59.

The Commonwealth then presented the testimony of Mr. Evancic, a pharmacist at the Pleasant Hills Apothecary (Pleasant Hills) located in Jefferson Hills, Pennsylvania. N.T., 11/21/14, at 133. In April and May 2013, Petitioner mailed several prescriptions to be filled at Pleasant Hills. *Id.*, at 133-134. Mr. Evancic considered this an unusual circumstance, as Petitioner lived in Bellwood, an approximate two and one-half hour drive from Pleasant Hills. *Id.* at 133. Dr. Davis, the prescribing physician, was also located a distance away, in Johnstown. *Id.* at 134. Petitioner submitted prescriptions for OxyContin, oxycodone, and fentanyl patches to Pleasant Hills on three separate occasions. *Id.* at 134-136.

Mr. Evancic received the first two prescriptions on April 4, 2013. *Id.* at 134. These prescriptions for 90 80-milligram pills of OxyContin and 15 100-microgram fentanyl patches were filled. *Id.* Three more prescriptions, for 180 80-milligram pills of OxyContin, 15 100-microgram patches, and 450 30-milligram pills of oxycodone, were filled at Pleasant Hills on May 2, 2013. *Id.* Although these prescriptions were also filled without issue, Mr. Evancic was concerned about the increase in quantity of pills being prescribed. *Id.* Petitioner mailed additional prescriptions with increased dosages of narcotics to Pleasant Hills in the third or fourth week of May. *Id.* at 135-36. At that point, Mr. Evancic contacted Petitioner. *Id.* at 135. As to why he contacted Petitioner, Mr. Evancic testified:

> When I received all of those, yeah, I took a significant pause with that because of the volume of narcotics being prescribed, the variety of narcotics being prescribed, the distance of the patient to my store, the distance of the

> physician to my store, none of it was adding up in terms of
> me being comfortable with it.

*Id.*

Mr. Evancic testified his pharmacy was provided guidelines by the United States Drug Enforcement Administration, which set forth certain "red flags" to consider before providing narcotic medications. N.T., 11/21/14, at 135. These "red flags" included patients or physicians who did not live near the pharmacy, as well as large volumes of narcotics being prescribed. *Id.* at 135-36. By Mr. Evancic's calculations, the May 2, 2013 prescriptions should have lasted Petitioner until June, yet Petitioner was having them filled in late May.[8] *Id.* at 135, 137. Mr. Evancic was "uncomfortable at best with the prescriptions," and he declined to fill them for Petitioner. *Id.* at 136.

Ms. Bawa, a clinician with Home Nursing Agency who performed a drug and alcohol assessment of Petitioner, testified on Petitioner's behalf. N.T., 11/21/14, at 155. Ms. Bawa's assessment consisted of a single face-to-face meeting which took place on January 30, 2014 and lasted approximately 45-60 minutes. *Id.* at 186-87. This assessment consisted of a 10-page "question and answer" form with answers supplied by Petitioner, family medical history provided by Petitioner, a drug and alcohol history as related to her by Petitioner, and the results of a requested drug screening. *Id.* at 166, 168.

Based on the information supplied by Petitioner, Ms. Bawa concluded Petitioner was not in need of further treatment. N.T., 11/21/14, at 187. Upon cross-examination, Ms. Bawa acknowledged she was unaware Petitioner was prescribed fentanyl patches, oxycodone, and Oxycontin by Dr. Davis, or that Petitioner

---

[8] Mr. Evancic could not recall the exact date Petitioner attempted to refill her prescriptions as he declined to fill them and returned the prescriptions to her. N.T., 11/21/17, at 136.

10

attempted to fill these prescriptions at a location far from her home. *Id.* at 190. While Petitioner reported her DUI, Ms. Bawa was not informed that Petitioner's probation was extended due to suspect urine samples. *Id.*

Petitioner testified the "whole mess" started with her 2008 DUI, which resulted from a myriad of issues in her personal life.[9] N.T., 11/21/14, at 220. Petitioner alleged a September 2007 near-fatal assault by her husband of almost 30 years resulted in the loss of her job. *Id.* After her husband left the marital home and "wiped out" their joint bank accounts, Petitioner was left without a means of supporting herself. *Id.* Petitioner was further emotionally distressed when her three sons and brother, all of whom serve in the Army, were deployed overseas. *Id.* At 220-21. Her DUI was the result of a "terrible decision." *Id.* At 221.

As to her reasons for declining the VRP, Petitioner testified she thought the program was voluntary. N.T., 11/21/14 at 223. Petitioner was under the impression that the programs she completed through ARD were the same programs offered through the VRP and she only needed to send a letter to Ms. Zerbe explaining why her participation was unnecessary. *Id.* at 224. When Petitioner received the March 18, 2011 letter from Ms. Zerbe stating she had not complied with the VRP enrollment procedures, Petitioner assumed her March 15, 2011 letter and Ms. Zerbe's had "crossed in the mail." *Id.* at 227.

With regard to evidence of her sobriety, Petitioner testified that she successfully completed the Pyramid drug and alcohol program in 2008. N.T., 11/21/14, at 244. She also cited drug screenings performed on January 20, 2014 and September 12, 2014, the results of which were negative for alcohol or drugs. *Id.* at 239, 248; Ex. Nos. R-11, R-15. Petitioner denied having an alcohol problem and

_____

[9] Absent from Petitioner's testimony was any mention of her hospitalization and outpatient treatment in 2008 for abuse of alcohol, opioids, and benzodiazepine.

testified she only attended AA meetings because she believed it would reflect favorably on her in disciplinary proceedings. N.T., 11/21/14, at 269-70.

As to her use of opiates, Petitioner testified she took them as part of a treatment plan by a physician who was licensed and in good standing at the time. N.T., 11/21/14, at 260. She used the Pleasant Hills pharmacy because it was located near her grandson's house and she traveled there approximately every two weeks. *Id.* at 276. Petitioner testified she stopped taking opioids, and treating with Dr. Davis in March 2013, because she was tired of the stigma attached to the medications she took.[10] *Id.* at 260. She felt Dr. Davis's plan of treatment was to continue taking medications indefinitely and she "didn't want that." *Id.* at 261. Petitioner testified she did not seek further medical treatment because she was not dependent on those medications. *Id.* at 276.

Petitioner generally took issue with the conclusions reached by Dr. Bernstein after each evaluation. She believed the 2011 Evaluation did not present a fair or clear picture of "who [she] was." N.T., 11/21/14, at 256. Petitioner asserted that the interview portion of the 2014 Evaluation lasted just over 20 minutes, and she perceived he merely "looked at one set of medical records and put a label on [her]." *Id.* at 258.

The hearing examiner issued a Proposed Adjudication and Order on November 23, 2015, in which she found that Petitioner suffered from multiple substance abuse disorders. C.R., Item No. 56, Proposed Adjudication and Order, Finding of Fact (F.F.) No. 108. She noted the absence of a documented program of sobriety or related treatment and found that such documentation was essential

---

[10] Petitioner's testimony that she stopped treating with Dr. Davis in March 2013 conflicts with her documented attempts to obtain medications prescribed by him in April-May 2013. N.T., 11/21/14, Ex. No. C-8.

12

because Petitioner could not be taken at her word. *Id.*, F.F. Nos. 101-02. Consequently, the hearing examiner concluded Petitioner was unsafe to practice nursing in the Commonwealth unless she participated in an ongoing substance abuse monitoring program for at least 5 years, subjected herself to monitoring by an outpatient drug and alcohol treatment program for 5 years, and attended bi-weekly AA meetings for 5 years. *Id.* at 21.

On December 24, 2015, Petitioner, represented by counsel, requested an extension of time to file exceptions to the Proposed Adjudication and Order. C.R, Item No. 59.The Board granted Petitioner's request approximately 10 months later, on October 26, 2016. Petitioner filed her Brief on Exceptions on October 28, 2016. Petitioner argued the evidence she introduced supported her claim of sobriety and she informally completed the VRP program through the passage of time and her participation in various rehabilitation programs. Petitioner requested that the proposed term of probation be modified to permit her participation in the VRP.

The Board filed its Final Adjudication and Order on October 31, 2017. The Board adopted the vast majority of the hearing examiner's findings as well as two of her three conclusions of law.[11] The Board took into consideration the fact that Petitioner has had no legal involvement since her initial DUI, as well as her expressed willingness to be monitored, and found a shorter term of probation was warranted. Accordingly, the Board's third conclusion of law decreased the hearing

---

[11] The Board revised F.F. No. 2 to reflect that Petitioner's nursing license is current through October 31, 2018. Board's Final Adjudication and Order at 2, n2. F.F. No. 3 was revised to reflect the Board's decision to decrease the number of years Petitioner was required to undergo substance abuse monitoring and attend AA meetings. *Id.*, n3. The Board adopted F.F. Nos. 1, 3-107, and 109 without change. *Id.*

13

examiner's recommended period of probation from 5 years to 3. C.R., Item No. 62, Final Adjudication and Order, at 2. This appeal followed.

## Issues

On appeal,[12] Petitioner argues the Board's findings of fact are not supported by "recent substantial evidence," but rather evidence which is "ancient." Petitioner's Brief at 3, 5. In a similar vein, Petitioner argues the penalty imposed by the Board is unfair because the length of time between initiation of disciplinary proceedings and the issuance of a decision by the Board renders the evidence against her stale and inadequate. *Id.* at 4. The Board responds that these issues were not raised by Petitioner in her Brief on Exceptions to the hearing examiner's proposed report and they are therefore waived.

## Discussion

First, we address the Board's waiver argument.

Practice and procedures before agencies of the Commonwealth, including the Board, are governed by the General Rules of Administrative Practice and Procedure (GRAPP). 1 Pa.Code §§ 31.1 – 35.251. Section 35.213 of GRAPP provides, in relevant part:

> Failure to file a brief on exceptions [to the proposed report] . . . shall constitute a waiver of all objections to the proposed report. Objections to any part of a proposed report which is not the subject of exceptions may not thereafter be raised before the agency head in oral argument, or in an application for agency rehearing or reconsideration, and shall be deemed to have been waived.

---

[12] Our standard of review is limited to determining whether the findings of fact are supported by substantial evidence, whether there has been an error of law, or whether there has been a violation of constitutional rights. *Bethea-Tumani v. Bureau of Prof'l and Occupational Affairs*, 993 A.2d 921, 925 n 6 (Pa. Cmwlth. 2010).

14

1 Pa. Code § 35.213. Section 703 of the Administrative Agency Law[13] and Pa.R.A.P. 1551(a) provides that this Court may not review on appeal any issue not raised before the agency. *See Niles v. Dep't of Transp.*, 674 A.2d 739, 741 (Pa. Cmwlth. 1995).

Petitioner argues the following in her Brief on Exceptions: 1) she reasserts her belief that the VRP was a voluntary program; 2) she presented evidence that supported her claim of continuous sobriety; and 3) Dr. Bernstein's opinion was flawed because he ignored records related to her 2007 post-assault hospitalization.[14] Critically, Petitioner does not argue Dr. Bernstein's expert opinion is too old to be reliable; rather, she contends he should have relied on older records which supported her claim of sobriety rather than older records which disputed it. Essentially, Petitioner argues her evidence is better than the Commonwealth's.

Petitioner concludes her Brief on Exceptions by claiming she "informally completed the [VRP] based on the passage of time, her participation in various rehabilitation programs and her years of sobriety." C.R., Item No. 61, Brief on Exceptions, at 4. She requests inclusion in the VRP as an alternative to probation. *Id.*

While Dr. Bernstein's 2014 Evaluation may not accurately reflect the state of Petitioner's sobriety in October 2017, when the Board issued its final Adjudication and Order, the same argument could have been made in October 2016, when

_____

[13] 2 Pa.C.S. § 703.

[14] Contradictorily, Petitioner argues Dr. Bernstein erred in relying on other records which were "several years old" at the time he formed his opinion.

15

Petitioner filed her Brief on Exceptions. Nothing prevented Petitioner from raising the issue at that time.[15]

Further, while Petitioner asserts in her brief that the Board "took too long to be fair" in making its decision, Petitioner's Brief at 4, Petitioner has not articulated what harm, if any, was suffered or how she was prejudiced by the Board's alleged delay in prosecuting this matter.[16] That delay, in fact, appears to have helped Petitioner, as she was able to continue working without restriction during the two years that elapsed between the issuance of Proposed and Final Orders. Additionally, the Board's Final Adjudication and Order reduced Petitioner's probationary period by two years. While we do not condone unnecessary delay in adjudicating these matters, we cannot, without evidence, conclude that Petitioner suffered prejudice or harm as a result of that delay.

---

[15] The phrase "based on the passage of time" clearly relates to Petitioner's argument that she informally completed the VRP. It cannot be construed as arguing that the evidence was too old to be reliable, or that the Board took too long to make its decision. C.R., Item No. 61, Brief on Exceptions, at 4.

[16] We are compelled to note that Petitioner is partly responsible for the multiple delays that occurred in this matter. The Board issued its first Order to Show Cause in December 2011 and Petitioner waited nearly two years to file her answer. Throughout the course of litigation, Petitioner filed three separate motions for continuance and three requests for additional time to file documents related to her case. C.R., Item Nos. 16, 22, 37, 40, 50, and 59. We do not question the merit of these motions, however, Petitioner is not in a position to cry foul at delays of her own making.

As Petitioner raised the issues herein for the first time on appeal we conclude they are waived.[17]  Accordingly, the Order of the Board is affirmed.


_____
ELLEN CEISLER, Judge

---

[17] Even had Petitioner raised these issues in her Brief on Exceptions, she has cited no case law or statutory authority to support her arguments.  At a minimum, the arguments contained within a brief must contain "such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a).  Where an appellate brief fails to cite to relevant authority, that claim is waived. *Sobat v. Borough of Midland*, 141 A.3d 618, 627 (Pa. Cmwlth. 2016).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Beth Patterson Dearmitt, RN,    :
                Petitioner    :
                             :
        v.                 :   No. 1767 C.D. 2017
                             :
Bureau of Professional and     :
Occupational Affairs, State      :
Board of Nursing,            :
                Respondent   :

# O R D E R

AND NOW, this 2nd day of October, 2018, the Order of the Bureau of Professional and Occupational Affairs, State Board of Nursing, dated October 31, 2017, is hereby AFFIRMED.

_____
ELLEN CEISLER, JUDGE